CULPEPPER, Judge.
This is a suit for past due rent on the sublease of farm land. Plaintiffs, Lennie Wiley and nine of her descendants, sued defendant, Bobby Frank Wiley, alleging Lennie Wiley entered into a six-year sublease agreement with defendant, and that he has failed to pay the full amount of rent. Defendant answered, alleging the agreement was intended to be an assignment of the lease, not a sublease, and that he has complied with all of his obligations under the assignment and owes plaintiffs nothing. The trial judge found the agreement was a sublease and that $105.00 in past rent was owed. Plaintiffs appealed. Defendant answered the appeal, seeking reversal of the judgment and avoidance of costs.
The substantial issue on appeal is the amount of rent owed plaintiffs under the sublease.
The facts pertinent to the issues on appeal are as follows: In September of 1967, Cap Wiley leased approximately 300 acres in Catahoula Parish from the Tensas Delta Land Company. About 50 acres was cleared, and the rest was wooded. The lease ran from September 6,1967 to December 31, 1977. As lessee, Wiley agreed to pay rentals on the following schedule.
Concurrently with the signing of this lease $300.00
January 1, 1969 300.00
January 1, 1970 300.00
January 1, 1971 300.00
January 1, 1972 300.00
January 1, 1973 3,000.00
January 1, 1974 3,000.00
January 1, 1975 3,000.00
January 1, 1976 3,000.00
January 1, 1977 3,000.00
Also in 1968, Cap Wiley borrowed money from Farmers Home Administration, principally to clear the rest of the land and buy farm equipment. The loan was secured by a mortgage on the leasehold interest and on approximately 60 acres and a home owned by Wiley.
On May 19, 1972, Cap Wiley died. He was survived by his widow, Lennie, and three sons. Lennie Wiley was unable to read and write. Representatives of the FHA approached Lennie and asked what she wished to do about the lease and mortgage. Lennie and her sons agreed together that a cousin, Bobby Frank Wiley, would farm the leased land.
On June 5,1972, Lennie and Bobby Frank entered into a written agreement on an FHA form entitled “Crop-Share — Cash Farm Lease”, which contains the following provisions pertinent to issues on appeal:
*3 “1. Rental rates. — The tenant agrees to pay the shares or quantities of crops and cash as indicated below:
CROPS OR ACRES SHARE CASH PLACE OF SALE DATE OF SALE IMPROVEMENTS RENT RENT OR DELIVERY DELIVERY OR _PAYMENT
Soybeans 300 Vi At elevator Fall-each where sold year

2. Additional agreements in regard to rental rates:
$3000.00 cash or Vi share whichever is greater for 1973 crop year and each year thereafter. All monies to come in joint check to landlord and Farmers Home Administration until FHA indebtedness is paid in full.

“E. TERM OF LEASE
1. Term. — The term of this lease shall be 6 year(s) from June 5,1972, to December 31, 1977, and this lease shall continue in effect from year to year thereafter until written notice of termination is given by either party to the other at least 0 months before expiration of this lease or any renewal.

F. MISCELLANEOUS PROVISIONS

5. Farm records. — The tenant agrees to keep financial and production records of all income and expenses of mutual interest, which records shall be accessible to the landlord at all times, and to furnish an annual report to the landlord on or before the following date-Accounts between the two parties shall be settled on or about-”
Bobby Frank planted and sold a soybean crop in 1972 and in 1974 through 1977. He never paid Lennie Wiley any money, but he paid the following amounts directly to Ten-sas Delta and the FHA:
AMOUNT PAID TO TENSAS YEAR DELTA AMOUNT PAID TO FARMERS HOME ADMINISTRATION
1972 $200.00 $4,746.26
1973 $3,000.00 $ (flood-no Crop)
1974 $3,000.00 $2,136.05
1975 $3,000.00 $2,594.27
1976 $3,000.00 ' $1,485.64
1977 $3,000.00 0
No accounting was ever made to plaintiffs, but, each year, Lennie Wiley went to the FHA offices to check to see if Bobby Frank paid on the mortgage debt. She never demanded any additional payments until the FHA obligation against her home was satisfied in 1976. In 1977, she asked to be paid according to the terms of the sublease. Bobby Frank denied owing any rent to her and claimed their agreement had terminated in 1976.
This suit was filed on March 30, 1978. Lennie Wiley died on October 12, 1978, and the administrator of líer estate was added as a party to this suit.
The primary dispute at trial was the intent of the parties in undertaking their agreement. Plaintiff properly objected to testimony contradicting the written terms of the sublease. On the issue of the amount of rent owed, plaintiffs introduced business records from Louisiana Delta Elevator to show the amount of defendant’s crop production for the years of the sublease. There was no objection to these records, which showed the following:
*4 “FRANK WILEY GRAIN SUMMARY 1972-1977
YEAR BU. RECEIVED AMOUNT PAID
1972 5891.37 $18,430.53
1973 Flood waters no purchase from Frank
1974 14,034.05 60,860.55
1975 5,140.35 22,678.91
1976 10,086.64 65,198.57
1977 9,846.08 61,287.84”
Plaintiffs contend defendant owes the difference between a one-fourth share of the total production receipts and the amounts paid to Tensas and the FHA, i. e., $34,315.
Defendant testified the Louisiana Delta records are the only evidence of his crop production because he kept no independent records. Defendant stated, however, that he was farming other land as well as the subleased land. Defendant contends the one-fourth share of production equaled approximately $5,000 per year, and that the sublease terminated in 1976, so he owes plaintiff nothing.
At the close of trial, the trial judge rendered the following oral reasons for judgment.
“Judge: Alright, gentlemen, the way I see it, this . . and this is no criticism of Mr. Routon or . . other than the fact that he is working for the Federal government . . the Feds always take care of the Feds. I think what was intended here was simply an assignment of this lease, Mr. Griffing, but we didn’t get that. We didn’t get that. In order to protect the FHA you used this sublease. When you use a sublease then you’ve got to . . the sublessor has got to be . . sublessee has got to assume any obligations he might have to the original lessee. Which was to pay a fourth of the rent. Alright. Now, I find that all the years except ’77 the fourth of the rent was in fact paid.
“Mr. Owens: ’76 and ’77, your Honor. “Judge: Was in fact paid and went to extinguish the indebtedness to FHA and to Tensas Delta. Alright. I have averaged these up for the years that we got them here and it looks like thirty one hundred and five . . my figures here show that. Now in 1973, Mr. Wiley paid three thousand dollars for and in behalf of Cap Wiley and his heirs. Had Cap Wiley been living it would have come out of his jeans, but it came out of Bobby Frank’s so the Cap Wiley estate is going to owe him for that . . three thousand dollars. And I get it all figured out here according to my figures, Mr. Bobby Frank Wiley owes the Cap Wiley estate a hundred and five dollars. That’s what the judgment is. The best I could get.
“Mr. Griffing: Actually it was thirty one hundred and five, but you give him credit for three thousand.
“Judge: Three thousand dollars, yes.
“Mr. Griffing: (unintelligible)
“Judge: That he paid in ’73. By doing that it’s a hundred and five dollars.
“Mr. Owens: Your Honor, I had asked for written reasons for judgment and I’d like to file a motion for appeal.
“Judge: Want the written reasons for judgment or as stated. You can just run that off the record. See, you didn’t prove anything that he made. I just had to take that average. That’s . . that is a figure that could be more. It could be less, but I have no proof of it, as Mr. Griffing pointed out before he put on his case.”
The oral reasons for judgment are not entirely clear. There is no doubt that the trial judge found the agreement was a sublease, and that defendant was obligated accordingly as the sublessee. Neither party has questioned this portion of the judgment nor raised any issue concerning the trial judge’s apparent misstatement in identifying defendant’s obligation as being “to pay one-fourth of the rent." Therefore, we will proceed on the basis that the sublease is to be enforced according to its written terms.
Plaintiffs contend the trial court erred in determining defendant only owed one year’s rent of $3,105. As the basis for this contention, plaintiffs make a two-part argument, which involves both the evidence and allocation of the burden of proof.
*5 First, plaintiffs maintain the Louisiana Delta Elevator records are the best evidence of defendant’s total production receipts, and that these records show a balance due of $34,315.49. As we understand the argument, plaintiffs argue the Louisiana Delta records are accurate and constitute prima facie evidence of the amount owed.
Plaintiffs point out that defendant presented no evidence in opposition to the records, other than his own testimony to the effect that the records included receipts from crops grown on other land as well as the subleased land. Plaintiffs take the position defendant’s testimony was too vague and inaccurate to establish any commingling of crops occurred. If, however, commingling was shown, plaintiffs then contend plaintiff had the burden of proving its extent, under the provision of the sublease which required defendant to keep such records.
We find much merit in plaintiff’s over-all position and will discuss each issue in the order raised. First, we accept the first stage of plaintiffs’ argument. There was no dispute that the Louisiana Delta records are the best evidence of defendant’s total production receipts for the years listed. Defendant testified that he himself relied on Louisiana Delta, and kept no independent records. Defendant testified he informed John Routon, who kept the records for the FHA, as to the amount of production from the sublease, but Mr. Routon testified FHA records were destroyed after two years. Defendant also testified he booked some beans, but, in answer to interrogatories, he stated booking records had been destroyed. We are convinced the Louisiana Delta records are objective, reliable accounts and that no other records exist.
The Louisiana Delta records, however, were not the only evidence of the amount of rent owed. Defendant was cross-examined on this issue and testified as follows:
“Q. Alright, in ’74, you paid three thousand dollars to Tensas Delta?
A. Right.
Q. And two thousand one hundred thirty six and five cents to Farmers Home Administration?
A. If that’s what the record shows, that’s what it is. Because I didn’t (unintelligible) that to be correct.
Q. Assuming . . . Would that be one quarter of what you made off that three hundred acres?
A. Above the three thousand dollars? I’ll be plain with you, Mr. Owens, it is more than what I made, because one truck load of them came out of another field that I had up the road. I had finished cutting beans down there and I went up the road and went to cutting beans and I cut one truck load and it rained and I went to the elevator and picked up the check and I carried it in . . Of course John didn’t know but Mrs. Wiley asked me was that off of Ten-sas Delta and I told her yeah, all but one truck load. I said put it all on there because I got to get it paid off.
* * * * * *
Q. How much do you estimate that you have in cultivation?
A. I’ve got two hundred and fifty seven acres in cultivation.
* * * * # *
Q. Are you maintaining that this two thousand one hundred and thirty six dollars plus the three thousand Ten-sas Delta equals to one quarter of what you made on the place?
A. I am. For a fact.
Q. And for the year 1975 three thousand plus two thousand five hundred and ninety four dollars is one quarter of what you made
A. Right.
Q. Of what grew on the place? And for the year 1976 three thousand dollars plus one thousand four hundred and eighty five dollars is one quarter .
A. No sir .
*6 Q. Of what you grew in ’76?
A. No sir. I’m not telling you that for '76 but every year prior to that that’s exactly what you’ve got and it came off that place. Now, I’m not telling you that for ’76 because it was my understanding that the lease was mine when it was paid off.
Q. Okay.
A. I paid it off in 1976 and I didn’t keep a record of it. After ’76 it was all in one thing because I paid Ten-sas Delta the three thousand dollars rent and the lease states . . if you will read the lease back, I believe that they were supposed to have paid the three thousand dollars and I paid it in the Pall when I harvested.

Q. And for the year of 1976, do you have any idea of how many years you raised on that place?
A. None whatsoever.
Q. Did you have a good crop?
A. I made a fair crop in ’76. Sure did.
Q. What about in 1977?
A. I made a fair crop in ’77.
Q. What did you get per bushel for beans in ’77? Do you remember?
A. I don’t know. You might could ask Mr. Edwards and find out what the average was. Mr. Routon probably could tell you what the average was in ’76 or ’77. I couldn’t, because I had booked some and some I didn’t book.
Judge: Did you make any . . when you went to the elevator did you make any record of which place the beans came off of?
A. No sir, I didn’t. Because after the old lady had told me what she did and told John what she did, well we just decided well it would . . I could just tell John what the place where it come off of and it would be alright because up the pri- or to ’77 everything was fine.
******
Q. Alright, Mr. Wiley, let me ask you this. You were farming other places in the area .
A. That’s right.
Q. At the time?
A. I was farming a place up the road of Mr. Roy Ferguson’s.
Q. And you knew you had to account for one quarter of the crop on this three hundred acres?
A. Until it was paid out.
Q. And you didn’t keep any books on this or any records to indicate how much you made on this particular tract of land over all this period of time?
A. I didn’t keep any records after Mrs. Wiley told me after ’72.
******
Q. But how did you know what you were supposed to pay?
A. Well, I consider myself to be honest and what I would take up there I would . . when I would take the check to Mr. Routon I would tell him . that that came off of Tensas Delta. I didn’t keep a complete record. I sure didn’t, Mr. Owens.
Judge: That year that you paid five thousand dollars, that five thousand was one-fourth, four fourths should be twenty thousand dollars.
A. Twenty thousand dollars.
Q. That’s right.
A. And you figure that, Mr. Owens. Now in ’74, you figure that over two hundred fifty seven acres and you take a hundred and twenty five acres out that the water took . stayed on and you figure that in ’75 I had planted it and the water came back in ’75 and took some beans that were waist high and I don’t know if John seen them, but Jerry Fairbanks can vouch for it. He went down there and looked after the water went down. I had beans that were waist high that the water took in ’75 *7 and I wound up with about a hundred twenty five or thirty acres on the place for three years in a row. And one year, nothing, in ’73.
Judge: Were there ever any years where the one fourth did not equal the three thousand dollars?
A. In ’73. Yes sir, your Honor, in ’73, but never no year after that because I always made more than that, more than the twelve thousand dollars. In other words, I would always have it held out to go on the debt.
Judge: In ’73 you paid three thousand dollars and got nothing.
A. Yes sir, that’s right. In ’73 I paid the three thousand dollars and got nothing.
Q. Of course, you knew you was going to have to pay the three thousand dollars if it wasn’t a limb out down there, didn’t you?
A. I knew I was going to pay the three thousand dollars but I wasn’t supposed to pay it in January.” (Emphasis supplied)
As we understand it, the issue raised is the effect of defendant’s testimony on plaintiffs’ prima facie evidence of the amount owed. We do not agree with plaintiffs’ conclusion that the testimony is too vague to have any effect. From defendant’s testimony, we have no difficulty in concluding that the Louisiana Delta records may reflect receipts from crops grown on other land.
This conclusion brings us to the second part of plaintiffs’ argument. Plaintiffs argue that if defendant’s testimony established commingling occurred, defendant should have the burden of proving its extent. We agree.
Under the sublease, defendant had a specific contractual obligation to maintain production records. For no apparent reason, defendant chose not to keep records, leaving a proper determination of the rent exclusively within his own ability to recall. Plaintiffs offered other reliable accounts indicating the amount of rent owed. If defendant wished to dispute these accounts, he had the burden of offering evidence that the accounts were misleading or incorrect. In addition to the sublease provisions, we are supported by the principle stated in Spyker v. International Paper Co., 173 La. 580, 138 So. 109 (1931) that:
“The law is that, when one of the parties to a suit has more means of knowledge concerning a matter to be proved than another, the onus is on him. State v. Bischoff, 146 La. 748, 85 So. 41; Griffin v. Drainage Commission, 110 La. 840, 34 So. 799, 801; Jones v. T. & P. Ry. Co., 125 La. 542, 51 So. 582, 136 Am.St.Rep. 339.”
We also come to this conclusion because of the specific issue raised. Commingling is a serious matter between lessor and lessee.
LSA-C.C. Article 2710 provides:
“Art. 2710. The lessee is bound:
1. To enjoy the thing leased as a good administrator, according to the use for which it was intended by the lease.
2. To pay the rent at the terms agreed on.”
LSA-R.S. 9:3204 provides:
“§ 3204. Lessor’s part of crop considered his property; disposition; penalty
In a lease of land for part of the crop, that part which the lessor is to receive is considered at all times the property of the lessor.
The lessee or any person acting with his consent who sells or disposes of the part of the crop belonging to the lessor shall be fined not more than one thousand dollars, or imprisoned for not more than one year, or both.”
In a case where the amount of production is disputed, we do not believe a lessee can be allowed to relieve himself of payment by merely suggesting commingling occurred at some time or by remaining silent as to the extent to which he himself has allowed the lessor’s share of production to become commingled with crops from other lands. In this case, we find the lessee who relies on the fact of commingling, must show its extent.
With the exception of 1973, when no crops were produced, defendant stated that *8 for all years prior to 1976, one-fourth of the production from the sublease was approximately $5,000. For the purposes of this discussion, we will accept this figure as sufficiently accurate. We find no conflict between this testimony and the Louisiana Delta records. Considering the total receipts shown for the year 1972 and 1975, the one-fourth share in these years could not have been more than $5,000. Defendant also testified that in both 1974 and 1975, he lost production from the area of the sublease due to high waters. From this, we are able to conclude production from the sublease in 1974 was about the same as in 1975. Defendant gave no details concerning the years 1976 and 1977, but stated production was good. We will discuss the effect of this testimony later.
At this point, we are able to dispose of plaintiffs’ contentions insofar as they concern the rent due for 1972 through 1975. Under the sublease, defendant owed either $3,000 or one-fourth share of production, whichever was greater. Based on defendant’s testimony and the Louisiana Delta records, we find defendant owed $3,000 for 1973 and $5,000 for 1972, 1974 and 1975. Plaintiffs have alleged payments to Tensas and FHA in these same amounts. Therefore, we find the evidence sufficient to support the trial court in finding the rent for 1972 through 1975 was paid.
We do not reach this same conclusion as to the years 1976 and 1977. As noted above, defendant failed to offer any testimony as to production for these years. The only evidence as to the rent owed for 1976 and 1977 is plaintiffs’ evidence. The Louisiana Delta records show that the number of bushels produced in 1975, when defendant testified he only obtained production from one-half the sublease. We find nothing in the record from which we can conclude commingling of crops occurred in 1976 and 1977. Therefore, we find plaintiffs’ evidence was sufficient proof of their demand of these years, and the trial court erred in holding otherwise.
The rent due for 1976 and 1977 was one-fourth share of the production, less the amounts paid on plaintiffs’ behalf to Tensas and FHA. Using the Louisiana Delta records, in 1976 defendant produced 10,086 bushels, 39 bushels per acre on 257 acres, which sold for $6.46 per bushel, a total of $65,198. On this basis, the one-fourth rent for 1976 was $16,299. In 1977, defendant produced 9846 bushels, 38 bushels per acre on 257 acres, which sold for $6.23 per bushel, a total of $61,387. Thus, the one-fourth rent for 1977 was $15,346.
The total rent for 1976 and 1977 is $31,-646. Defendant must be credited with $3,000 paid to Tensas for 1976 and 1977, a total of $6,000, plus the $1,485 balance paid on the FHA mortgage on October 14, 1976, a total credit to defendant of $7,485. Thus, defendant owes plaintiffs a balance of $24,-160 for rents for the years 1976 and 1977.
Plaintiffs contend the trial judge erred in awarding a $3,000 credit to defendant for rent paid in 1973, the year when no crops were produced. We agree. The written sublease clearly requires defendant to pay the $3,000 each year. We find no basis for allowing this credit.
For the reasons assigned, the judgment appealed is amended to increase the award to plaintiffs to the sum of $24,160. Otherwise, the judgment is affirmed at defendant’s cost.
AFFIRMED, AS AMENDED.